LAMAR, Justice,
for the Court.
¶ 1. Gary Lee Malone’s right leg was amputated below the knee approximately two years after he suffered a work-related *302 injury. Subsequently, Malone instigated this bad-faith lawsuit against several defendants, including his former employer, Nabors Drilling USA, Inc. (Nabors), and a workers’ compensation insurance claims adjuster, Gallagher Bassett Services, Inc. (Gallagher Bassett). Malone argued that the defendants’ bad-faith delay in paying his viable workers’ compensation claim proximately caused him to delay medical treatment, eventually resulting in the loss of his leg.
¶ 2. Nabors cross-claimed against Gallagher Bassett for breach of contract, asserting that it was a third-party beneficiary of a contract between Nabors’s workers’ compensation insurance carrier, CNA Insurance Services (CNA), and Gallagher Bassett. Nabors argued that Gallagher Bassett’s bad-faith delay in paying Malone’s workers’ compensation claim proximately caused Nabors to incur potential liability and defense costs from Malone’s bad-faith lawsuit.
¶ 3. Subsequently, Nabors and Malone entered into a written agreement commonly referred to as a “Mary Carter” settlement agreement,[1] in which Nabors paid Malone $1.5 million and remained a litigant in the case. In the settlement agreement, the parties agreed that Na-bors’s liability to Malone arose out of Gallagher Bassett’s bad-faith failure to timely pay Malone’s workers’ compensation claim.
¶ 4. After a trial in the Circuit Court of Jones County, the jury found Gallagher Bassett and Nabors liable for bad faith in handling Malone’s workers’ compensation claim and awarded compensatory damages to Malone in the amount of $250,000. The jury also found Gallagher Bassett liable to Nabors on the cross-claim for breach of contract and awarded compensatory damages in the amount of $1.25 million. Gallagher Bassett appeals; Malone and Nabors both cross-appeal.
FACTS
¶ 5. Malone worked for Nabors as a motorman on an oil rig in Jones County, Mississippi. Nabors, an oil and gas drilling company, had workers’ compensation insurance with CNA Insurance Company (CNA). CNA had a claims-service agreement with Gallagher Bassett under which Gallagher Bassett would adjust Nabors’s workers’ compensation claims during times relevant to this appeal.
¶ 6. We set out the facts leading up to Malone’s instigation of this lawsuit in the following time line:
July 28, 2000 — Malone struck his front lower right leg on a beam at work and suffered a cut at the site of a recurrent skin infection.[2] Malone reported the injury to his supervisor, Bobby Wallace, who put a Band-Aid on the cut, filled out an incident report, and notified his supervisor, Rob Holbrook.
August 7, 2000 — Malone visited his family physician, Dr. William Moak, who *303 recommended that Malone keep the cut clean and bandaged.
August 14, 2000 — At a follow-up visit, Dr. Moak observed that one centimeter of Malone’s shin bone was exposed in the middle of the cut. Dr. Moak informed Malone that he needed skin-graft surgery and referred him to the Southern Bone and Joint Clinic.
August 15, 2000 — Malone informed Wallace that he needed surgery; Wallace instructed him to discuss the matter with Holbrook.
August 16, 2000 — Gallagher Bassett’s claims adjuster, Deborah Robichaux, called Wallace to discuss Malone’s injury. Wallace informed Robichaux that, although Malone had cut his leg at work and he needed surgery, Malone’s need for surgery might be attributable to his pre-existing condition. After the telephone conversation, Robichaux did nothing further toward investigating Malone’s potential workers’ compensation claim.
August 16, 2000 — Dr. Keith Melancon and Dr. Rocco Barbieri at the Southern Bone and Joint Clinic recommended that Malone have surgery.
August 16, 2000 — Malone discussed his anticipated surgery with Holbrook. According to Malone, Holbrook refused to allow him to make a workers’ compensation claim for the surgery.[3] In contrast, Holbrook testified that, although Malone had informed him that he needed surgery, Malone did not tell him the need for surgery was attributable to his work-related leg injury. It is undisputed that Malone asked Holbrook to approve his working eight weeks in a row in order to have eight weeks off to recover from the surgery; Holbrook approved the request.
August 30, 2000 — Dr. Barbieri diagnosed Malone with a bone infection known as chronic osteomyelitis, and informed him that delaying surgery would risk the loss of his leg. After this visit, Malone worked eight weeks in a row.
October 23, 2000 — Dr. Barbieri performed a bone scraping and a skin-graft surgery on Malone’s leg wound. Malone’s family medical insurer paid his medical expenses.
January 24, 2001 — Malone fell and broke his injured leg; he suffered continuing problems with his leg thereafter.
January 31, 2001 — Nabors terminated Malone due to his inability to return to work due to a non-work-related injury.
February 26, 2001 — Malone applied for social security benefits; in his application, he swore that he had not filed a workers’ compensation claim, nor did he plan to do so.
November 19, 2001 — Malone contacted Nabors’s safety director, Jerry Poole, and informed him he was ready to return to work after the injury.
November 27, 2001 — Poole completed a “B-3 first report of injury” form[4] and faxed the form to Robichaux at Gallagher Bassett.
*304 December 5, 2001 — Gallagher Bassett opened a claim file and sent medical release forms to Malone.
January 9, 2002 — Nabors entered information concerning Malone’s injury into its incidents database.
June 21, 2002 — Robichaux closed the claim file on Malone’s injury because she had never received medical records from Malone.
July 12, 2002 — Malone filed a petition to controvert with the Mississippi Workers’ Compensation Commission (the Commission).
July 23, 2002 — Robichaux reopened the claim file after being notified of the petition to controvert.
August 19, 2002 — Dr. Barbieri amputated Malone’s injured leg below the knee due to a recurrence of infection.
September 9, 2002 — Gallagher Bassett set Malone’s claim for payment of full workers’ compensation indemnity and medical benefits. Subsequently, the Commission entered an order recognizing that Malone had received a net balance of $111,684.22 in indemnity benefits after subtracting sums paid to him in penalties and interest, and his attorney’s fees.
December 3, 2003 — Malone filed the instant bad-faith lawsuit in the Circuit Court of Jones County, alleging that the defendant’s delay in processing this workers’ compensation claim caused his injured leg to deteriorate to the point that it required amputation.

A. Pre-trial proceedings

¶ 7. On September 30, 2005, Nabors cross-claimed against Gallagher Bassett, asserting it was a third-party beneficiary of Gallagher Bassett’s contract with CNA. Nabors argued that Gallagher Bassett’s bad-faith delay in paying the claim had proximately caused Malone’s damages, and it sought to recover from Gallagher Bas-sett all costs it incurred in the defense of Malone’s bad-faith claim.
¶ 8. On October 15, 2005, Malone and Nabors entered into a Mary Carter agreement that resolved all claims between them. In the agreement, Nabors agreed to pay Malone $1.5 million for his physical injuries caused by the bad-faith actions of Gallagher Bassett, and Nabors reserved the right to continue as a defendant in the matter. The parties further agreed that Nabors would receive the first $250,000 of any sums awarded to either party against Gallagher Bassett, and Malone and Nabors would divide equally any additional sums awarded to either party.
¶ 9. On November 2, 2005, Gallagher Bassett filed a cross-claim against Nabors that sought indemnification for any damages arising out of Malone’s bad-faith claim.

B. The trial

¶ 10. At trial, Malone sought to prove that Gallagher Bassett’s failure to investigate and pay his legitimate workers’ compensation claim had caused him to delay the surgery, which proximately caused the amputation of his leg. He presented the expert testimony of Dr. Melancon, who testified to a reasonable degree of medical certainty that the delay caused an increase in infection that necessitated aggressive surgery, and caused or contributed to the amputation. Nabors attempted to show that Gallagher Bassett’s failure to promptly investigate and pay the claim after August 16, 2000, proximately caused Malone’s damages, constituted a breach of Gallagher Bassett’s contract with CNA, and proximately caused Nabors’s liability to Malone. Gallagher Bassett’s position was that it had no duty to investigate the claim until November 27, 2001, when Poole faxed the *305 B-3 first-report-of-injury form to Robi-ehaux.

C. The jury verdicts and post-trial ■proceedings

¶ 11. After all parties had rested at trial, the jury assessed compensatory damages to Malone in the amount of $250,000. The jury allocated fault as follows: 42.5 percent to Gallagher Bassett, 42.5 percent to Nabors, and 15 percent to Malone. Applying these percentages of fault, the trial court entered final judgments in favor of Malone against Nabors and Gallagher Bas-sett in the amounts of $106,250 each.
¶ 12. The jury also found for Nabors on its cross-claim against Gallagher Bassett and assessed damages in the amount of $1.25 million. The trial court entered a final judgment on this verdict. The trial court declined to submit the issue of punitive damages to the jury. After the entry of final judgment, Gallagher Bassett moved for a set-off and for judgment notwithstanding the verdict (JNOV). Malone moved for a JNOV, additur, or a new trial on damages, and Nabors moved for a JNOV seeking additur. The trial court denied all post-trial motions.
ANALYSIS
¶ 13. While the parties raise multiple issues before this Court, the most challenging issue we face is that we are confronted with jury verdicts which reflect contradiction and inconsistency. The jury was asked to consider both the independent tort of bad-faith denial of a workers’ compensation claim and a separate claim, purely contractual in nature, between employer Nabors and adjuster Gallagher Bas-sett. It is our duty to harmonize these verdicts, if at all possible. See Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963).
¶ 14. On the one hand, the jury returned a verdict in favor of Malone and allocated fault at 42.5 percent each to Na-bors and Gallagher Bassett and established Malone’s damages in the amount of $250,000. The jury’s second verdict found, on a theory of breach of contract and/or indemnity (the jury was instructed on both), that Gallagher Bassett was liable to Nabors for $1.25 million — a figure five times the amount which the jury had established as reasonable damages to Malone.
¶ 15. Additionally, jury instruction D-34 (an instruction presented by Nabors) told the jury that in order to find for Nabors on their claim, it must find “that nothing Nabors Drilling, U.S.A., L.P., did contributed to the damages, if any, suffered by Malone.... ” The jury’s finding that Nabors was as much at fault as Gallagher Bassett clearly is in direct conflict with its finding that Nabors did nothing which contributed to Malone’s damages.
¶ 16. In post-trial motions, Malone argued inter alia for additur, claiming that the verdict was the result of bias and confusion resulting from conflicting jury instructions. Nabors, post-trial, additionally sought additur. Gallagher Bassett, in post-trial motions, argued that both verdicts fail as a matter of law, and pointed the court to the contradictions raised by the verdicts. The trial court denied all post-trial motions.
¶ 17. We have done our best to reconcile the verdicts after an exegetic review of the record, especially concentrating on the jury instructions, jury verdict, and the post-trial motions. However, we are left with the inescapable conclusion that the jury obviously was (as Malone asserted in post-trial motions) confused. Ultimately, we conclude that there is no way these two verdicts can be reconciled, as they create an uncertainty that is fundamentally unac *306 ceptable. After careful consideration, we find that the appropriate remedy is to vacate both judgments and remand this case for a new trial. See Gallick v. Baltimore & Ohio R.R. Co., 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) (ruling that appellate courts are free to remand for new trial when the jury delivers inconsistent verdicts that cannot be harmonized); see also Gordon v. Degelmann, 29 F.3d 295, 298-99 (7th Cir.1994) (ruling that “[tjhere is no priority among inconsistent verdicts ... [and] the proper thing to do is to hold a new trial with respect to all affected parties”); Wood v. Holiday Inns, Inc., 508 F.2d 167, 175 (5th Cir.1975) (ruling that “[w]here verdicts in the same case are inconsistent on their faces indicating that the jury was confused, a new trial is certainly appropriate....”)
¶ 18. Apparently, all parties elected for strategic reasons to try both the bad-faith claim and the breaeh-of-contract/indemnity cases together, making full disclosure to the jury of the settlement agreement between Nabors and Malone. The case presented multiple legal theories, and the result was a completely confused jury.[5] Our rules provide that a trial court has broad discretion to consolidate or order separate trials for a cross-claim. Miss. R. Civ. P. 42(b).[6] Separate trials are appropriate when necessary to avoid undue confusion for the jury. What is clearly evident in retrospect was perhaps not so obvious to the court and the attorneys at the outset. Upon remand, we strongly urge the trial court to consider severing Nabors’s cross-claim for trial.
CONCLUSION
¶ 19. The judgments of the circuit court are reversed and remanded for proceedings consistent with this opinion.
¶ 20. REVERSED AND REMANDED.
WALLER, C.J., CARLSON, P.J., DICKINSON AND KITCHENS, JJ., CONCUR. GRAVES, P.J., CONCURS IN RESULT ONLY. CHANDLER, J., DISSENTS WITH SEPARATE WRITTEN OPINION. RANDOLPH AND PIERCE, JJ., NOT PARTICIPATING.

. A Mary Carter agreement is a contract whereby the contracting defendant settles with the plaintiff, but remains a litigant in the case and will be reimbursed a specified amount of the plaintiff's recovery from the other defendants. McDaniel v. Anheuser-Busch, Inc., 987 F.2d 298 (5th Cir.1993).

. It is undisputed that Malone had longstanding medical problems at this location on his right leg for which he had received prior medical treatment. The deposition of his family physician, Dr. William Moak, reveals that Dr. Moak had treated the site on several occasions for skin infection and, later, for osteomyelitis, an infection of the bone. Dr. Rocco Barbieri, an orthopedist, testified that Malone reported a twenty-year history of problems at the site.

. Malone testified that, not only did Holbrook refuse to allow him to seek workers’ compensation benefits, but Wallace told him not to tell anyone at the district office or the corporate office about having received medical treatment, because the rig would lose its safety bonus for that period if there was a workers' compensation injury.

. In the event of an injury which causes lost time in excess of five days, Mississippi Code Section 71-3-67 requires the employer to file a report with the Mississippi Workers’ Compensation Commission on a form approved by the Commission. Miss.Code Ann. § 71-3-67 (Rev.2000). This form is commonly known as a ’’B-3” form. There was no evidence that Nabors had completed a B-3 form prior to November 27, 2001.

. Three hours into deliberations, the jury sent a note to the court inquiring “Who will pay Gary Malone’s future medical expenses, Na-bors or Nabors’s insurance company?”

. Mississippi Rule of Civil Procedure 42(b) provides that:
[t]he court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counter-claims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by Section 31 of the Mississippi Constitution of 1890.
Miss. R. Civ. P. 42(b).